Good morning. May it please the Court. My name is Nicole Atlin, and I represent Petitioner Associated Electric Cooperative, Inc. This is not a case about the filed rate doctrine. An Associated is not seeking to modify, change, supersede, or waive any filed rate. There is no filed rate for the compensation Associated seeks from SPP in connection with the emergency energy assistance Associated provided in the form of emergency power sales. Nor does there need to be a filed rate for Associated to recover actual costs it incurred to provide SPP and SPP's members with power on an emergency basis during Winter Storm Yuri. It is uncontested that Associated is not subject to FERC's rate-making authority under the Federal Power Act. As such, Associated is not required to file the rates it charges for energy sales with FERC or seek approval of those charges from FERC. FERC therefore exceeded its statutory authority by applying the filed rate doctrine to bar Associated from being made whole for its provision of emergency energy following SPP's urgent requests. FERC oversteps its authority despite the clear recognition throughout its brief that the Federal Power Act requires regulated utilities to file their rates and charges with FERC. As an unregulated cooperative utility, Associated is not bound by the filed rate doctrine, and FERC has no authority over the rates Associated negotiates with counterparties or the charges Associated collects for its power sales. Contrary to FERC's arguments, in this case there is no conflict between a filed rate and an unfiled agreement, and Associated is not seeking to alter any FERC filed rate. Rather, the SPP tariff authorizes balancing authorities, such as Associated and SPP, to request emergency energy assistance from each other. The tariff also recognizes that specific arrangements for that assistance and the charges for emergency power sales may be negotiated between SPP and neighboring balancing authorities, such as Associated. Nothing in the tariff caps the amount of compensation to be paid for emergency energy. In fact, the tariff specifically contemplates that other forms of agreements outside of the tariff will be entered into for additional compensation. Well, isn't that the market participation agreement? I mean, that seems to me to be what FERC and the district court hung their hat on. Yes, Your Honor. So the market participation agreement applies to entities within, that are transacting business within SPP. It does not, it is separate and apart from balancing authorities. Market participants often have obligations to SPP. In particular, they have load serving obligations and are required to stand ready to serve based on those obligations. Balancing authorities have no such obligations. But doesn't the market participation agreement specifically contemplate emergency provision of power? The market participation agreement does not. The attachment AE of the tariff section 6.6 discusses emergency energy assistance among balancing authorities, not among market participants. And that is because when emergency energy assistance is needed, it's because market participants have been unable to meet their load serving obligations. So SPP must look elsewhere outside of the market. It may not label it as an emergency, but doesn't it label it as an import interchange transaction? If so or if not, why would FERC be arbitrary in thinking that it is an interchange transaction? So attachment AE of the tariff section 6.6 contemplates a two-step process for emergency energy assistance. The first is to settle it as an import transaction at what is called a locational marginal price. However, there is a second step in attachment AE section 6.6 that contemplates additional compensation over and above the locational marginal price for import schedules, and that is to be negotiated bilaterally among balancing authorities. And nothing in that section or in the tariff caps the amount of compensation that can be paid for emergency energy because it is subject to that bilateral negotiation. Nothing also dictates the form that those agreements must take once they are bilaterally negotiated. Rather, the tariff's allowance for additional compensation recognizes that emergencies create circumstances that may warrant payment over and above a locational marginal price for emergency energy. And in this case, the charges for emergency energy assistance were negotiated during exigent circumstances requiring immediate action as a neighboring balancing authority associated responded to SPP's urgent request by agreeing to sell tens of thousands of megawatts of energy to SPP to ensure that SPP and its customers did not lose power during life-threatening cold temperatures. Now, you said there was an agreement on compensation. There wasn't an agreement on the dollar amount, is that correct? It's just the agreement was that you won't lose any money on the deal. Yes, essentially the dissociated would be kept whole if it were to come to SPP's assistance during the emergency, which is precisely what happened and is that compensation that we were seeking at the district court level. Why did they back out of the agreement? I think that is probably a question that is something that would be before the district court in terms of evaluating the formation of the agreement and whether it binds SPP to its commitment. And associated sent this power based on those assurances. And as I mentioned, SPP then breached that agreement and FERC itself acknowledged in its orders below that the claims brought by associated in district court are not directly about wholesale rates and instead implicate contract law and tort claims. And where disputes involve breach of contract and related claims, courts routinely evaluate the intent of the parties to determine whether a contract was formed. That analysis necessarily includes a review of the parties course of conduct and communications. FERC therefore improperly exercised primary jurisdiction over what FERC itself describes as a dispute involving contract interpretation. Where this has previously been the case, FERC has properly declined to exercise primary jurisdiction. It should have done the same here. Again, the filed rate doctrine bars a regulated utility from collecting rates other than those that have first been filed with and received approval from FERC. The FPA also specifically exempts from FERC's jurisdiction cooperative utilities such as associated, including the requirement to file their rates and charges for wholesale electric service. In fact, the entire scheme of attachment AE places the procedures for and the cost recovery associated with emergency energy assistance outside of the tariff. As I mentioned, it establishes a two-step process for payments related to that emergency energy assistance. Step one is to settle at the locational marginal price for an import transaction. That first step, however, does not establish a default rate or act as a cap on compensation. That is because it then goes on to a second step. Step two contemplates that emergency energy assistance is a different type of service that is not priced the same in all instances. It therefore allows balancing authorities capable of providing that type of assistance to one another to negotiate for additional compensation over and above a locational marginal price. That is precisely what happened here. Associated is not, therefore, seeking to alter or waive a filed rate or asking this court to set aside a reasonable or asking anyone to set a reasonable rate. Let me go back. You said several times that FERC should not have exercise primary jurisdiction. As I understand it, that issue basically comes down to whether one of the three, what are known as ARCLA factors, would support their jurisdiction. It seems to me that they basically said all three factors do, although I think you only need one. How do we review that determination? Do we give any deference to the agency's decision that they have primary jurisdiction that those ARCLA factors apply? Is that clear error? De novo? What's your view on that? I believe that there is no deference due to the agency here because, first of all, I don't think that it is necessarily the case that only one factor need to apply. But in this case, none of the three factors actually apply. This contract dispute does not require FERC's expertise. There is no sort of consideration of how technical documents interact to form a filed rate. It is clear that the tariff establishes a mechanism for additional compensation in the context of emergency energy assistance. This dispute does not threaten to undermine FERC's sole authority over wholesale energy transactions. FERC does not have unfettered authority to adjudicate disputes involving regulated entities or all wholesale power sales. That is precisely the regulatory framework of the Federal Power Act. Cooperative utilities are specifically exempt from the Federal Power Act provisions and the filed rate doctrine. There is also no need for uniformity. This is a case that does not implicate the application of a filed rate, and the circumstances surrounding this specific emergency energy sales are not likely to ever be repeated. If we don't agree with you on the applicability of the filed rate doctrine, that there is a filed rate in this case, then your jurisdictional argument is no good. You'd concede that, right? No, I do not concede that, Your Honor. I think this kind of goes back to the two-step process I was describing before. To the extent that a filed rate governs these transactions, SPP has already paid what that first step in the Attachment 6.6 contemplates. That is sort of the end of FERC's authority over the matter. The next step is to look to whether there was an agreement formed between the parties for additional compensation outside of the tariff, and that is... If there's a tariff, doesn't that supersede all other negotiations? Well, this tariff specifically contemplates additional negotiations that will take place outside of the tariff, and here, one of the parties to one of those negotiated agreements is not a FERC jurisdictional utility. Are you referring to the part of 6.6 that says the joint operating agreements may include additional market-related charges for the provision of emergency energy assistance? Yes, Your Honor, that is precisely what I'm referring to. Does the joint operating agreement between these parties include any such charges or credits? Well, Your Honor, the joint operating agreement reference in this tariff here is not to any particular joint operating agreement. It is just a recognition that balancing authorities may negotiate for these types of transactions, and in Associated's case, those negotiations took place during emergency circumstances, and they were acting urgently and at SPP's requests, and so the basis for... Negotiations constituted a joint operating agreement under the meaning of 6.6? Yes. Was there also a pre-existing written joint operating agreement? Yes, Your Honor, but that pre-existing joint operating agreement did not contemplate this form of emergency energy assistance in terms of power sales or establish any such rate or charges associated with those sales. I understand that, but your argument then depends on characterizing the communications during the emergency period as a joint operating agreement under 6.6. Is that right? Well, yes, as an agreement that the parties are free to negotiate. Joint operating agreement, again, lower case is just a term that is used to sort of describe bilateral negotiations among balancing authorities. Well, the first paragraph refers to the applicable joint operating agreement. You don't think that's a term of art or a reference to a particular agreement? Well, again, the first paragraph is also not referring to any specific joint operating agreement. It is simply saying that the definition of emergency energy assistance and the procedures for that emergency energy assistance will be outside of the tariff in some other agreement and lower case joint operating agreement. I understand. I understand the argument. Go ahead. Thank you. Just going back to the fact that FERC acknowledged in its orders below that this is not a claim directly about wholesale rates and instead implicates contract law and tort claims. Those are the type of claims that courts routinely evaluate and make determinations on. Thank you. And the question here that should have properly been before the court is, was there an oral agreement for emergency power sales? Did SPP breach that agreement? Is associated entitled to recover under state law breach of contract and equitable remedy claims? And I have reserved five minutes for rebuttal. I'm coming right up on that time, but I'm happy to answer any questions that you may have before then. Very well. Thank you for your argument. Thank you. Mr. Shainer, we'll hear from you. May it please the court, Houston Shainer for Federal Energy Regulatory Commission. And I will be going for 15 minutes. My colleague from SPP will have five minutes. You might adjust the microphone. You can move the lectern up with the button. There we go. The closer you are to the mic, the better we can hear you. Hear me better? Yes, go ahead. Thank you. This case begins and ends with the tariff here, and that's really all the court needs to decide. Well, that part of the case is simple. There are some parts of the tariff that are somewhat complicated and require specialized expertise. And Judge Grunder, I think you really identified the correct starting point here, and really what undermines the logic of the petitioner's case. That's that all of these transactions are import interchange transactions. That definition assumes that it's power coming from outside the Southwest Power Balancing Authority, i.e. from another balancing authority's area, into the SPP marketplace. That's what makes it an import, and also what makes it an interchange transaction. And I don't really hear my colleague to dispute that anymore, that these are now import interchange transactions. But that's particularly important because Section 6.6 of the tariff says that import interchange transactions, including those for emergency assistance, are settled just like all other import interchange transactions. And it points to Section 8.6.3, which then goes on to say that all these imports and exports are settled at the locational marginal price, and that's the tariff term. And those three aspects are the key links of the Commission's reasoning here, and they're entitled to deference under, going back to the Western Pacific Railroad case, the Supreme Court's decision in Morgan Stanley in 2008, and then the Supreme Court's decision in 2016 in Electric Power Supply Authority, as well as other out-of-circuit authority about sort of Chevron-like deference. As long as the petitioners cannot show that the Commission unreasonably interpreted one of those three links, then the Court has to side with the Commission here and affirm. Now, my colleague mentioned that, as I take it, I understand her to say that there's sort of a step one in some of those import interchange transactions. She says that's not a default cap, but clearly she's leaving out the third step here, and the bottom, the first sentence of the second paragraph in Section 6.6, which says import transactions for emergency assistance are settled like other imports. Now, her second step is sort of the new argument here, and she's saying that there's some measure of additional compensation, that while the word additional is used in the final paragraph of Section 6.6, the second paragraph, and you can find this on page 10 of the red brief, Judge Malloy, if you're looking for it, the additional compensation there necessarily assumes that there's some other preexisting amount of compensation, i.e., a default price, and that's the locational marginal price that that paragraph is talking about when it's settled like all other transactions. Now, my colleague indicates that what she styles as, the oil agreement she styles as is not that additional compensation, but that's simply not the case. As you'll look in the very next sentence, and I believe as Judge Malloy or Judge Carlton pointed out, Section 6.6 says that the joint operating agreement may include that other compensation, but here we actually know what the joint operating agreement looks like. It's a written document. It was filed with commission in 2008 and incorporated into an SPP tariff in 2011. That joint operating agreement with AECI, unlike other joint operating agreements between an SPP and MISO, an SPP and a Colorado entity, did not include those additional charges, so we are left with the default price. Now, certainly they could have included that, and in fact they did begin including that in a revised version of the joint operating agreement that was negotiated and I believe filed with commission after the initial order, certainly after the petition, after the events and transactions that arose here. All right, but I took her to be arguing today that the oil communications were themselves an additional joint operating agreement and that the reference in 6.6 paragraph 2 to joint operating agreements, plural, was not limited to the written agreement that preexisted. Well, Judge Carlton, I'd ask you to remember that this is a tariff provision that is talking about a wide variety of joint operating agreements with lots of entities, not just with AECI, so certainly it's going to contemplate plural agreements like with other entities like MISO, but not necessarily AECI. AECI only had one joint operating agreement effective at any given time, and that was a filed rate during the case of these, part of the filed rate, during the pendency of these oil transactions, which clearly shows the oil transactions are not joint operating agreements. I don't understand any authority to suggest that oil agreements are somehow effective as a filed rate if they're not, I'm sorry, effective over a filed rate if they're not as Louisiana Gas v. Hall from the Supreme Court in 1981 says. That's the black letter law that oil agreements cannot override a filed rate. I would also suggest that there are sort of two thresholds. But doesn't the filed rate include a joint operating agreement by reference? It certainly can, but we need to be precise, I think, about what the filed rate here is. And the Commission did say the joint operating agreement is part of the filed rate, meaning the documents that are on file with the Commission that it needed to consider. And partly that's because the joint operating agreement, you'll see in the first paragraph of 6.6, it talks about the procedures for assistance here. And these entities did begin to engage the procedures for assistance, and Article 6 of the joint operating agreement on file talks about that. There will be cooperation, but no party to this case has ever said that it required AECI to then make import interchange transactions and sell into the SPP integrated marketplace. Let's assume, for purposes of argument, that they had actually prepared a written amendment to the joint operating agreement setting an emergency rate. I don't know if you could do that in a couple hours that they had, but let's say they in theory did that. As I understand it, even if they had done that, it would not be effective without FERC approval? It can only be effective prospectively. That's the related corollary to the filed rate doctrine. Prospective from when? From the date it's prepared? From the rate it's on file. No, no. Prospectively starting at what point in time? It can be very quickly once it's on file with the commission. And I think there's a good example in the Old Dominion case. If you look at the background of that case. What says it has to be on file with the commission? If it's going to include the price term as part of the filed rate. That is the filed rate doctrine. Unfiled contracts do not govern or change or modify the filed rate. And that's, again, Arkansas and Louisiana. Even under Judge Moy's hypothetical, if they had done a written addendum to the joint operating agreement, it would not become effective until it was on file with the commission? Correct. And I think it's important to remember the joint operating agreement here was only part of the filed rate because Southwest Power Pool filed it in 2008. It was long on file with the commission. It wasn't simply a written contract hidden in files away. The commission was aware of it. And other entities also filed their joint operating agreements. Does FERC have to approve that? Or is filing it sufficient? It can take effect. I believe it's accepted for filing and then the commission can review it. But I think maybe one thing to ease your mind is to get to the nub of this question. The Old Dominion case shows how this can work very effectively and very quickly. There was another winter storm called the Polar Vortex in 2014. There was another RTO called PJM sort of on the East Coast. They knew they were going to have this problem where the costs were going to exceed the price cap under the tariff in this case. PJM went to the commission with an emergency request for a prospective waiver, but prospective only because that's all they can do under the filed rate doctrine. They filed that, I believe it's on January 23rd. It was a waiver to allow make whole pricing for some of these entities or what they also call a true up, essentially what AACI is asking for here. The commission approved that waiver and made it effective the next day. So they got immediate prospective relief. And we could have had something like here if the parties had thought to do that. Now, it is unfortunate they did not think to do that. And certainly there may be some sympathy, but the filed rate doctrine, it can be harsh, but it actually protects the public. It protects out, I'm sorry, go ahead. From a big picture perspective, if we step back from the detail, this seems to be a case of no good deed goes unpunished. And I wonder if it doesn't set up bad incentives going forward. But maybe it's a matter of just filing the correct paperwork at the correct time. But I don't think anybody disputed their costs were $58, $59 million, and they were paid about half of their costs. Well, I'll let my SPP counsel talk on whether or not the costs were their true actual costs. I believe my understanding, and I wasn't involved in the district court litigation, is there actually may be some dispute over that and discovery about what represented their actual costs here. But the commission clearly didn't adjudicate that question. And that's because the filed rate doctrine, it says it's black letter law, that you have to take the rate, then file. And if you make a mistake or if there's an intentional misrepresentation, it simply doesn't matter. The equities, whatever they may mean in one particular case, don't override the doctrine. And that's because the doctrine operates to the benefit of the public as a whole. Remember here, SPP has to manage this organization for a large number of other utilities. And they rely on SPP and the predictable application of the tariff to ensure that they are protected by the locational marginal price. And I'll also point out, I believe it's paragraph 22 of the federal complaint, the day before these transactions, AECI was actually exporting power from SPP into AECI. So the shoe can be on the other foot, and they can be protected by the locational marginal price and the tariffs operation in other circumstances. So really all you're saying is Associated Electric should have said, we're willing to help you, but before we send you the power, we've got to write this up and send it in to FERC. Is that what it comes down to? Really what they should have done is negotiated a joint operating agreement better earlier. But you gave the example of the 2014 storm. Certainly. To show that the commission can move very quickly. I thought you were saying that they could have or should have done that here. Given where they were at the time of the emergency, the operating agreement didn't address the issue. Are you saying that's what they should have done? I think that could be one of the things they should have done, certainly. It may not have mitigated all of the issue here, because there were obviously transactions on at least one day. But these transactions went for roughly a week, and they could have moved earlier. Well, you think they should have said, no, we won't provide it? We're just going to let the system collapse? No, that would be my personal opinion. They don't have any obligation to provide it, do they? I believe the parties, you know, the commission didn't speak on the issue. Blame it on FERC. We're not going to provide it. Blame it on the government. They've got this technical rule, and so it's going to cost our people millions. We're not going to provide it. We'll let the system collapse. It sounds like that's what you're recommending they do. No. I would disagree, Judge Collins. Certainly, the equities are important here, right? But it's unfortunate that there wasn't better planning before this happened to resolve these issues on the back end. We would have never had to face these issues in the first place. Does FERC do anything to encourage that sort of planning? I would say that Use a joint operating agreement. Does it say to the parties? Is there any procedure to provide for emergencies? I'm not aware of the commission setting that as a, you know, any sort of rule for going out and requiring joint operating agreements. Just leave it up to the parties to get it? But certainly, they are sophisticated and understand it. And the commission, again, in Old Dominion, acted within one day on the May call waiver quite quickly. Can you have, as an emergency, under the file rate doctrine, can you just say that we will make whole under your emergency provision? Or does it have to set a specific rate? I don't know why a properly filed joint operating agreement couldn't do that. And that is what the prospective waiver, as I understand it, in Old Dominion did. That's what you said. In Old Dominion, they did that. Is that something that could be put into any operating agreement, as far as you know? I'm not aware of any reason it couldn't be. And it may actually be in the MISO or public service Colorado agreements. I don't think those are fully in the record. Then it would just be a question of calculating the amounts later. And if there's a dispute, like you said, there might be here. It would have to be resolved. But it would at least be in place that they're entitled to some number. Correct. And they certainly got a large amount of compensation here. I would also, on the joint operating agreement argument, I don't understand them to have made this sort of new argument that the oral contracts are a joint operating agreement in either the opening brief or perhaps more importantly for the court's jurisdiction in the rehearing request. I didn't take their arguments to be making that. And the rehearing request certainly is a statutory exhaustion requirement that limits the court's subject matter jurisdiction. I would also note on the market participant agreement, my colleague mentioned that it's uncontested that there's no jurisdiction over AACI. It is certainly contested. They consented to be governed by the tariff in the market participant agreement. They claim it's only for the power marketing function. That is not a distinct legal entity. It's simply people at AACI who execute those operations. And more importantly, for the commission's statutory obligations, they cannot allow the clearly regulated entity, namely SPP, to violate the filed rate. And that's in rehearing order paragraph 30, where the commission says that they cite Arkansas, Louisiana, and Gatsby Hall to say that even if, essentially, even if we don't directly govern AACI, we have to ensure SPP is following the law here. I see there's not much more time, so I will certainly answer any further questions you might have. Thank you for your argument. Thank you. Mr. Bennett, we'll hear from you. Thank you, Your Honor. Good morning. May it please the Court, Matt Bennett for Southwest Power Pool. I'd like to begin by discussing the filed rate issue. Your Honor asked whether these joint operating agreements need to be on file at FERC and what authority does FERC have to force these agreements to be on file. That's the Federal Power Act Section 205, Section C, which requires all rules and regulations for jurisdictional energy sales to be set forth in schedules that are filed at FERC before they take effect. And Subsection D, which says any rate changes, such as the one that AACI has alleged here to the joint operating agreement, must be filed before they can take effect. That's at page A2 of FERC's addendum to its brief. The filed rate doctrine has been in effect ever since the Federal Power Act was enacted. In fact, longer than that, it goes back to the Interstate Commerce Act. And it requires any agreement that SPP, as a FERC jurisdictional entity, enters into to be filed at FERC and approved before it can take effect. There's nothing that would have prevented you, though, from honoring the agreement, is there? Absolutely, there is, Your Honor. Our tariff does not allow us to pay a price other than the price that's calculated under the tariff. The FERC filed tariff governs all purchases and sales in the integrated marketplace. These were import interchange transactions that were entered into the integrated marketplace. So we were duty-bound legally to pay AACI the FERC-approved rate, which is the rate that was calculated under the tariff, which in this case is the real-time locational marginal price, or LMP. You mean you could have been liable to somebody else if you'd overpaid? That's exactly right, Your Honor. The whole purpose of the filed rate doctrine, particularly when it comes to these organized markets, is to protect everybody in the market. It prevents SPP from entering into side deals with any party that other parties don't have notice of. That's why everything has to be filed in and writing in advance before SPP can actually charge or pay anything to anybody. Who owns SPP? What kind of entity is it? SPP is a nonprofit organization. It acts as a pass-through entity. So any dollar that it has to pay out to somebody, it has to collect from somebody else. SPP has no independent revenues. SPP does not have a financial stake in the market. We literally match supply and demand. That's what we do. And we can't do that in any way that would violate our FERC-filed agreements, which include the tariff. With respect to Section 6.6 of the tariff, which both my colleague and the Commission Counsel discussed, and as Judge Colleton, as you pointed out, the operative sentence here is the joint operating agreements may include additional market-related charges. Prior to standing up here today, I have never heard AECI refer to the telephone conversations that operators had during the midst of a winter storm as a joint operating agreement. I would agree with my colleague from FERC that they waived that argument by not presenting it to the Commission and giving the Commission the opportunity to assess its merits. I will also note that in every other pleading that they filed, both at FERC and in this Court, they've referred to the FERC-filed joint operating agreement as the operative joint operating agreement between the two parties, and that's FERC Rate Schedule 10 filed by SPP and approved by FERC in 2008 as amended in 2022. To address this very situation, unfortunately for AECI, that occurred after the events. As FERC counsel pointed out, any rate changes can only take effect prospectively. I believe FERC counsel was also asked the question of, does the Commission ever get involved when these types of disputes arise to try to correct the problem going forward? That actually happened in the PJM polar vortex situation. We've talked a lot about the Old Dominion cases in our briefs, and they were talked about here, but there was a companion case called Duke Energy. In that case, Duke Energy Corporation had alleged that the PJM tariff was unjust and unreasonable because it didn't allow them to recover similar costs that Old Dominion was seeking to recover. FERC denied that complaint on the same basis that it denied Old Dominion's complaint, but it initiated a new investigation under Section 206 of the Federal Power Act, which authorizes FERC to investigate and make prospective rate changes when it finds that an existing rate is unjust and unreasonable. That's exactly what they did in PJM. They haven't done that here, but they can and do have the power to force rate changes when they find something unjust and unreasonable. One other point I'd like to make is that AECI hangs its hat on the idea that these were balancing authority employees versus power marketing employees, but they pointed to nothing in the law, in precedent, in FERC regulation, or anywhere else that would authorize employees of a company to orally contract and negotiate around the corporation's FERC-filed rate. I don't understand why they think that in this situation, their individual balancing authority employees could supersede what the corporation had agreed to and that SPP had filed a FERC. I see I'm out of time. I appreciate the court's time. Thank you for your argument. We'll hear rebuttal, Ms. Allen. Yes. Thank you. In the brief time I have left, I would like to address three points. The first goes to, I think, what we are now referring to as the Malloy hypothetical, and that is could the parties have negotiated and gotten something on file immediately? Theoretically, they could have. However, SPP, as a regulated entity, is required to file an agreement for the services that it provides. Associated Electric, as a non-regulated utility, is not required to file an agreement for the services that it provides. Here, Associated was providing the services, and Associated is seeking compensation for those services. So there was no requirement that Associated run to FERC to get something on file in order to be able to recover its costs. Second, to the ODEC issue, ODEC was acting as a market participant who was under an obligation to supply power to the market at PJM's request. Associated Electric is a balancing authority and had no obligation, which I think this court recognized, to provide emergency energy assistance. It could have said, no, sorry, we're not in a position to do so, we're not under an obligation to do so. Or it could have said, no, we won't provide it until you file an amendment. Correct, but these were exigent circumstances, and there wasn't really sufficient time to do that. But in any event, Associated... You just said they could have said no. They could have said no. Oh, I'm sorry, I might have misunderstood your question. I don't think you misunderstood, but you said you could have said no, and then when I said, well, you could have said no, not until you file the amendment, you said, well, it was exigent circumstances. Oh, sorry. As though you couldn't say no. No, I misspoke. They could have said no, regardless of the sort of circumstances or a negotiation to get something on file. All right, so why isn't that a problem for your client then? They said yes, even though the rates were not on file. Because my client, as the provider of services of emergency energy assistance, and as the party seeking compensation, is not under an obligation to file with FERC in order to recover the charges that are associated with its power sales. I would also like to address another point very briefly, and that is this idea that the SPP tariff provides notice to its members as to what charges they may be assessed. That tariff, and specifically Section 6.6, provides notice that SPP may negotiate with other balancing authorities for additional compensation. It does not say what that additional compensation will be. So SPP members and the public is on notice that there may be grounds for additional compensation if that is the subject to a bilaterally negotiated agreement among balancing authorities, which is precisely what we have here. Unless there are other questions. I just have one. This argument you engaged in with Judge Colleton about the oral conversation effectively being a joint operating agreement, was that made in your brief? The idea that we are, under the tariff and under this provision, entitled to negotiate agreements is, yes, throughout our brief. We are balancing authorities, negotiate all the time. That wasn't really the question. The question is whether you argued in your brief, and I would add, did you argue to FERC, that the phone calls were a joint operating agreement under the meaning of 6.6? I don't think we specifically argued that the phone calls were a joint operating agreement. The argument is that the tariff entitles balancing authorities to bilaterally negotiate agreements for additional compensation, and that is precisely what happened here. All right. Well, thank you for your argument. Thank you. I see my time is almost up. I would just like to say that we ask this court to remand the case to FERC with instructions to dismiss SPP's petition for declaratory order. Thank you. Very well. Thank you to all counsel. The case is submitted, and the court will file a decision in due course. Counsel are excused, and Madam Clerk, you may call the next case.